**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| THE GABELLI ASSET FUND, THE GABELLI DIVIDEND & INCOME TRUST, THE GABELLI EQUITY TRUST INC., THE GABELLI FOCUS FIVE FUND, THE GABELLI MULTIMEDIA TRUST INC., THE GABELLI VALUE 25 FUND INC., GAMCO INTERNATIONAL SICAV and GAMCO ASSET MANAGEMENT INC., on behalf of themselves and all others similarly situated, | Case No. <br><br> **CLASS ACTION** <br><br> <u>JURY TRIAL DEMANDED</u> |
|                    Plaintiffs, <br><br> v. <br><br> RESIDEO TECHNOLOGIES, INC., HONEYWELL INTERNATIONAL INC., MICHAEL G. NEFKENS and JOSEPH D. RAGAN III, <br><br>                    Defendants. | |

<u>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**</u>

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ..................................................................................... 2

II.    JURISDICTION AND VENUE .............................................................. 9

III.   PARTIES ............................................................................................... 10

      A.    Plaintiffs ..................................................................................... 10

      B.    Corporate Defendants................................................................ 11

      C.    Individual Defendants ............................................................... 11

IV.   SUMMARY OF THE FRAUD ............................................................. 12

      A.    Honeywell Engineers the Spin-Off of Resideo to Jettison the
           Underperforming Homes Business and Legacy
           Environmental Liabilities........................................................... 12

      B.    Resideo Touts the Success of the Spin-Off and Deflects Early
           Concerns About Supply Chain Issues ........................................ 18

      C.    Despite Lowering 2019 Full Year Guidance, Resideo Falsely
           Assures Investors the Company's Supply Chain Issues Are
           Resolved and the Company is at a "Strategic Inflection Point"................. 23

      D.    Resideo's Management Continues to Tout the Success of the
           Spin-Off and Characterizes the Decline in RTS Performance
           as Temporary .............................................................................. 24

      E.    Resideo Initiates a Comprehensive Operational and Financial
           Review and is Forced to Admit a Slowdown in the RTS and
           Comfort Businesses..................................................................... 26

      F.    Post-Class Period Developments ............................................... 27

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING
    STATEMENTS ....................................................................................... 28

      A.    Honeywell's False and Misleading Statements Prior to the
           Spin-Off...................................................................................... 29

      B.    Resideo's False and Misleading Statements Prior to the Spin-
           Off.............................................................................................. 34

      C.    Defendants' False and Misleading Statements in 2018 ............. 36

      D.    Defendants' False and Misleading Statements During 2019 ..... 40

VI.   THE TRUTH IS PARTIALLY DISCLOSED ...................................... 46

VII.    POST-CLASS PERIOD DEVELOPMENTS .......................................................... 47

VIII.   ADDITIONAL ALLEGATIONS OF HONEYWELL'S CONTROL
        OVER RESIDEO ........................................................................................... 49

IX.     ADDITIONAL ALLEGATIONS OF SCIENTER .................................................. 50

X.      PRESUMPTION OF RELIANCE ........................................................................ 51

XI.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR
        AND BESPEAKS CAUTION DOCTRINE ........................................................ 52

XII.    CLASS ACTION ALLEGATIONS ....................................................................... 53

XIII.   CLAIMS FOR RELIEF ........................................................................................ 54

COUNT I For Violations of Section 10(b) of the Exchange Act and Rule
        10b-5 Against All Defendants ....................................................................... 54

COUNT II For Violations of Section 20(a) of the Exchange Act Against
        Defendants Honeywell, Nefkens and Ragan ................................................ 56

PRAYER FOR RELIEF .......................................................................................................... 58

JURY DEMAND ..................................................................................................................... 58

Plaintiffs The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Equity Trust Inc., The Gabelli Focus Five Fund, The Gabelli Multimedia Trust Inc., The Gabelli Value 25 Fund Inc., GAMCO International SICAV and GAMCO Asset Management Inc. (collectively, the "Plaintiffs") bring this class action (the "Action") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of themselves and a class defined as:

> All persons or entities that purchased or otherwise acquired common stock of Resideo Technologies, Inc. ("Resideo" or the "Company") during the period October 15, 2018 through October 22, 2019, inclusive (the "Class Period"), and were damaged thereby (the "Class").

Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on an investigation conducted by and through Plaintiffs' counsel, which included, among other things, consultation with experts, and a review of public filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, investor presentations, earnings calls, analyst research and media reports concerning Resideo and Honeywell International Inc. ("Honeywell").

Counsel's investigation into the facts supporting the claims alleged herein continues, and many of the relevant facts are known only to Defendants Resideo, Honeywell, Michael G. Nefkins and Joseph D. Ragan III (the "Defendants") or are exclusively within Defendants' custody or control. Plaintiffs believe that substantial

additional evidentiary support for the allegations set forth herein will be uncovered after a reasonable opportunity for further investigation and discovery of Defendants.

## I.   INTRODUCTION

1.      This federal securities class action arises from Defendants' misstatements and omissions before, during and after a transaction whereby Honeywell combined unrelated business units within its various divisions and "spun" them off to Honeywell shareholders as a repackaged publicly-traded "stand-alone" company named Resideo (the "Spin-Off").  Each investor who owned Honeywell common stock as of the October 16, 2018 record date of the Spin-Off (the "Record-Date") received one share of Resideo for every six shares of Honeywell that investor owned.  Resideo shares began trading on the New York Stock Exchange (the "NYSE") on a "when-issued" basis on October 15, 2018. On October 29, 2018, Honeywell shareholders received their Resideo shares and the new securities began normal trading on the NYSE under the symbol "REZI:"

| Spin-Off Details: Resideo | |
|---|---|
| Announcement | October 10, 2017 |
| Initial Form-10 Filing | August 23, 2018 |
| Latest Form-10 Filing | October 2, 2018 |
| When-Issued Trading | October15, 2018 |
| Record date | October 16, 2018 |
| Distribution Date | October 29, 2018 |
| Regular-Way Trading | October 29, 2018 |
| Spin-Off Ratio | 1:6 |
| Tax-Status | Tax-Free |

2.      Honeywell had a massive financial motive to engage in the Spin-Off.  By

2

doing so, Honeywell was able to hand-select underperforming businesses to transfer into Resideo and, in exchange, require Resideo (and by extension its newly-minted shareholders who received shares in the Spin-Off or purchased in the secondary market during the Class Period) to:

- Undertake up to $140 million per year of Honeywell's legacy environmental liabilities for the next 25 years;

- Pay a one-time "dividend" of $1.2 billion to Honeywell, funded from $400 million in new secured notes and $800 million in term loans; and

- Pay tens of millions of dollars to Honeywell in annual royalties from the use of Honeywell's trademarks.

3.       Put another way, Honeywell paid itself $1.2 billion to dump underperforming assets, avoid billions of dollars in obligations over the next two decades related to past environmental issues, while still collecting revenue from the spun-off businesses through royalties.

4.       Honeywell and Resideo disclosed to the investing public the financial terms of the Spin-Off, including the annual environmental liabilities and $1.2 billion payment. But they did not disclose to the investing public that one of the two business segments that would comprise Resideo – the "Products & Solutions" segment which was made up of Honeywell Home products related to residential comfort (such as thermostats and humidifiers) and security (such as panels and sensors) – had been thrown together piecemeal by Honeywell from unrelated parts and, consequently, contained severe product, supply chain and governance problems.  Because of these problems, almost nothing the Defendants said about the outlook for the "Products & Solutions" business was accurate

and, in fact, the Defendants had no reasonable basis for the earnings guidance they issued before and during the Class Period.

5.     Indeed, on December 11, 2019, Resideo's new Chief Financial Officer, Robert Ryder (who replaced Defendant Ragan), gave a presentation at an investor conference during which he revealed the Company's severe problems since its inception, including the very process and structure of the Spin-Off itself.  Among other things, Mr. Ryder revealed that, contrary to Honeywell's and Resideo's statements before and during the Class Period about the integration of the business lines and strong management structure, in reality the Products & Solutions business was "thrown together" by Honeywell from random parts, thereby causing fissures in the segment and systemic governance problems:

> A big thing was a lack of pre-existing standalone business . . . essentially the whole products and solutions business was various businesses within divisions of Honeywell and they kind of picked individual pieces up and kind of threw them together and call [sic] that products and solutions which we'll talk about, and that kind of has some governance ramifications.

6.     Mr. Ryder also acknowledged severe fundamental problems with the Company's products, manufacturing and distribution:

> We probably have too many [products], we might be in too many places, maybe our manufacturing facilities aren't in the right places with the right freight lines, maybe capacity utilization isn't where we would want to be.

7.     Mr. Ryder also outlined further structural problems at the Company and changes that are needed to solve the problems inherited from Honeywell:

> We're going to make some pretty sizeable reductions in

[selling, general and administrative expenses] to right-size the business for what we think new sales will be when we eliminate some of the [products] and maybe look at some of the geographies and make sure we have the right [selling, general and administrative expenses], because all this stuff came over from Honeywell, and was probably structured for a much bigger, more complex business. Which we no longer have.  There is a lot of governance with a clear escalation path.

8.    Mr. Ryder's revelations exposed a reality at Resideo that is almost exactly the opposite of what Defendants said about the Company before and during the Class Period.  Mr. Ryder's statements make it clear that – far from the positive characterizations and projections for the newly spun-off Company – Defendants omitted that the processes for the Spin-Off and projections were flawed from the beginning.  Honeywell took a bunch of products from various business units that did not otherwise have historic-separate P&Ls as stand-alone businesses or independent governance and operational structures and just assigned numbers to them without regard to how they would be integrated to operate as a stand-alone Company.

9.    In an August 2018 presentation entitled "Resideo at a Glance" published on Honeywell's investor relations website more than two months before the Spin-Off, Honeywell touted Resideo as the "[l]eading global provider of critical comfort and security solutions," with a "strong management operating system and attractive financial profile." Honeywell likewise touted Resideo's purported "diversified revenue streams, strong segment profits and limited capital expenditure needs."

10.   Indeed, to allay investor concerns that Honeywell was merely disposing of unprofitable business units and environmental liability, Honeywell's management

repeatedly promoted Resideo as a viable stand-alone business with strong fundamentals. In this regard, on September 6, 2018, Honeywell's CEO, Darius Adamczyk, went on CNBC's *Mad Money* to discuss the Spin-Off.  During the interview with Jim Cramer, Adamczyk stated "there are a couple businesses that frankly were terrific businesses, Garrett [Motion] and Resideo, but frankly, they didn't fit the Honeywell profile." Adamczyk further stated that the businesses being spun off were "terrific franchises that have performed exceptionally well," and that Resideo was particularly attractive given its "huge install base, its presence in millions upon millions of homes [] and a great distribution [] to go with it."

11.     Similarly, in an October 10, 2018 Form 8-K, Resideo touted its "enviable market position" and cited "diversified revenue streams, strong segment profits and limited capital expenditure needs [as] just a few of the reasons Resideo has a bright future."  Days prior to the Spin-Off, Defendant Nefkens, Resideo's CEO (and formerly the head of Honeywell Homes), bragged about Resideo's supposed strong competitive posture, stating "I'm now feeling very good about our footprint.  My competitors right now are the ones that are concerned."

12.     Such positive statements continued following the Spin-Off.  In its November 13, 2018 earnings release on the heels of the Spin-Off, Defendant Nefkens emphasized continued future growth based on Resideo's performance as part of Honeywell: "Our performance as part of Honeywell over the past three years demonstrates a well-run business that is on-track to deliver continued growth in 2018 and beyond."  In this regard, the Company "reaffirmed its guidance for full-year 2018 at the high end of the previously

stated range," and "reiterated its expectations for full-year 2019, including 4 percent organic revenue growth."

13.     Nefkens' statement in November 2018 representing to investors that Resideo had "perform[ed] as part of Honeywell over the past three years" (*i.e.*, as if it was a cohesive unit), and that that performance "demonstrate[d] a well-run business [] on-track to deliver continued growth" was false when made.   Resideo was not a single business unit of Honeywell, but a hodgepodge of unrelated business units, and Nefkens had no reasonable basis to state that Resideo's business had collectively performed well as part of Honeywell.

14.     Throughout the Class Period, the Resideo Defendants also continued to represent to investors that, among other things:  (i) there was strong demand for Resideo's "connected" home products, including the Company's line of smart thermostats; (ii) Resideo remained competitive in the sale of nonconnected products; and (iii) Resideo had a "Mature, Integrated Supply Chain" that "Continued [the] Application of Best-in-Class Honeywell Operating System."

15.     However, by March 2019, only five months after the Spin-Off, Defendants were forced partially to reveal that all was in fact not well with the newly-created Resideo. In reporting the Company's fourth quarter and full-year 2018 financial results, Resideo announced its intention to lower its 2019 financial forecasts and further revealed a 20% decrease in profit for the Product & Solutions division.   This announcement caused Resideo's common stock price to decline by $5.79 per share, to close at $18.96 on March 7, 2019.   Nevertheless, the stock price remained inflated as Defendants continued to mislead the market.

16.     Just two days later, on March 9, 2019, Defendant Nefkens was quoted as saying "we successfully executed the spin and met or exceeded financial expectations" and that "the disruption from the spin is mostly behind us."  Nefkens further reassured investors that "we are at a strategic inflection point" and that "this effectively is the first time that we are having all of our costs under control."

17.     Defendants continued to mislead investors well in to 2019.  For example, when announcing an EBITDA drop of 36% in the Company's Second Quarter 2019 financial results on August 7, 2019,  Nefkens deflected attention by stating that "our momentum continued with strong top-line growth during the second quarter" and representing that Resideo was "focused on executing [] organic and inorganic growth strategies, as well as [] cost reduction programs" that would "continue to drive growth and long-term value creation for shareholders."

18.     The truth was partially disclosed on October 22, 2019 when Resideo issued a press release announcing preliminary results for the third quarter 2019.  Specifically, Resideo disclosed that the "Products & Solutions segment experienced revenue decline in certain product families of the Comfort business and in its [RTS] gas combustion business."  Resideo attributed the Comfort business declines to "lower sales volumes in non-connected thermostats" and explained: "[w]e believe a poor pre-spin cutover from the prior generation of non-connected thermostats to the T-Series line impacted the adoption of mid-level T-Series thermostats.  The cutover effects became markedly more pronounced in the third quarter after the prior generation of non-connected thermostats were discontinued."

19.    Resideo further disclosed preliminary third quarter EBITDA of $77-$79 million, missing analyst expectations of $98-$101 million, and downwardly revised its 2019 full year EBITDA guidance to a range of $330-$350 million from $410-$430 million. On the same day, the Company announced the replacement of its then-CFO, Defendant Ragan.  These disclosures caused the price of Resideo's common stock to decline by over 37%, or $5.37 per share.

20.    All told, the corrective disclosures in March and October alone caused Resideo stock price to drop by $11.16 per share – or more than 39% of its $28.00 per share opening price on the October 29, 2019 Spin-Off day – costing investors more than $1.3 billion.

21.    By contrast, and evidencing the success of the scheme, during the period from the Spin-Off to the end of the Class Period, Honeywell's stock price increased more than 19%.

## II.    JURISDICTION AND VENUE

22.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

23.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

24.    Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual

who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District to render the exercise of jurisdiction over the Defendant by this Court permissible under traditional notions of fair play and substantial justice. Each Individual Defendant was a Resideo senior executive during the Class Period.

25.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mail, interstate telephone communications and the facilities of a national securities exchange.

## III.    PARTIES

### A.    Plaintiffs

26.    Plaintiffs The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Equity Trust Inc., The Gabelli Focus Five Fund, The Gabelli Multimedia Trust Inc., The Gabelli Value 25 Fund Inc. and GAMCO International SICAV (the "Funds") are closed-end investment management companies headquartered in Rye, New York. As set forth in the attached Certification, the Funds purchased Resideo common stock during the Class Period and were injured thereby.

27.    Plaintiff GAMCO Asset Management Inc. ("GAMCO") is an investment management company located in Rye, New York that offers portfolio management, financial planning and investment advisory services to clients. As set forth in the attached Certification, GAMCO purchased Resideo common stock during the Class Period and was injured thereby.

### B.    Corporate Defendants

28.    Defendant Resideo Technologies, Inc. is a Delaware corporation with its principal executive offices at 901 E 6th St., Austin, Texas 78702.    Resideo was incorporated on April 24, 2018 and became an independently publicly traded company as a result of a *pro rata* distribution of Resideo's common stock to shareholders of Honeywell International Inc. on October 29, 2018.  The Company's common stock trades on the NYSE under the ticker symbol "REZI."  Defendant Resideo is named in Count I (violations of Section 10(b) of the Exchange Act).

29.    Defendant Honeywell International Inc. is a Delaware corporation with its principal executive offices at 300 South Tryon Street, Charlotte, North Carolina. Honeywell's common stock is traded on the NYSE under the symbol "HON."  Defendant Honeywell is named in Counts I (violations of Section 10(b) of the Exchange Act) and Count II (violations of Section 20(a) of the Exchange Act).

### C.    Individual Defendants

30.    Defendant Michael G. Nefkens ("Nefkens") has served as Resideo's President and Chief Executive Officer, as well as a Director, from the Spin-Off to the present.  Prior to the Spin-Off, Nefkens served as President and Chief Executive Officer of Honeywell's Home Business from May to October 2018.  Defendant Nefkens signed the Company's materially misstated public filings, as set forth below.  On December 2, 2019, Resideo announced Nefkens would be stepping down as Resideo's CEO and a director following the eventual naming of a successor.  Defendant Nefkens is named in Count I (violations of Section 10(b) of the Exchange Act) and Count II (violations of Section 20(a)

of the Exchange Act).

31.    Defendant Joseph D. Ragan III ("Ragan") served as Resideo's Executive Vice President and Chief Financial Officer from the Spin-Off until November 6, 2019. Prior to the Spin-Off, Ragan served as Chief Financial Officer of Honeywell Homes from August to October 2018.  Defendant Ragan signed the Company's false and misleading public filings, as set forth below.  Defendant Ragan is named in Count I (violations of Section 10b of the Exchange Act) and Count II (violations of Section 20(a) of the Exchange Act).

32.    Together Nefkens and Ragan are referred to herein as the "Individual Defendants."

## IV.    SUMMARY OF THE FRAUD

### A.    Honeywell Engineers the Spin-Off of Resideo to Jettison the Underperforming Homes Business and Legacy Environmental Liabilities

33.    Honeywell is a multinational industrial conglomerate which generates annual revenues exceeding $41.8 billion and produces a variety of commercial and consumer products through four Strategic Business Units:  Honeywell Aerospace, Honeywell Building Technologies, Safety and Productivity Solutions, and Honeywell Performance Materials and Technologies.

34.    Over its 100+ year history, Honeywell along with its predecessor AlliedSignal, Inc. incurred massive actual and contingent environmental remediation and tort liabilities as a result of industrial activities related to the manufacture of specialized chemicals, aerospace and automotive products, as well as the processing of nuclear

materials (defined above as the "Legacy Environmental Liabilities").  The vast costs associated with cleanup and remediation of the Legacy Environmental Liabilities represented a significant and ongoing threat to Honeywell's cash position.

35.     Indeed, while Honeywell's SEC filings identify certain – but not all – Legacy Environmental Liabilities, they likely comprise hundreds if not thousands of individual environmental remediation sites across the country, many of which were polluted as a result of Honeywell's illegal disposal of hazardous waste produced as a result of its business operations and for which Honeywell faces scores of civil and regulatory actions seeking to recover the costs of remediation.  Honeywell has expended over $4 billion over the last 15 years on environmental remediation projects alone (excluding tort liabilities) including the Onondaga Lake Superfund site, referred to as "the most polluted lake in the country," chromium pollution cleanup in Baltimore's Inner Harbor and in Jersey City, and perchloroethylene pollution at a North Hollywood, California aerospace manufacturing facility.  Honeywell is also the subject of myriad ongoing litigation arising from its past polluting activities including, for example, litigation in connection with its processing of uranium hexafluoride resulting in the discharge of ionizing radiation and radioactive contamination of Metropolis, Illinois.

36.     Beginning in at least 2016, Honeywell began exploring ways to reduce its exposure to the Legacy Environmental Liabilities by engaging in a portfolio review and exploring various strategic transactions.  Ultimately, Honeywell's management devised a scheme to rid itself of the Legacy Environmental Liabilities by spinning off one of Honeywell's underperforming business units and then forcing the spun-off entity to

indemnify Honeywell for the Legacy Environmental Liabilities.

37.     The Spin-Off candidate Honeywell chose was the company's $4.5 billion Homes and Global Distribution businesses – then separate business units within the Home and Building Technologies ("HBT") division.  The HBT Homes division manufactured residential thermostats, air quality systems, boiler and water heater controls, interior and exterior cameras and security detection equipment, while the Global Distribution business was engaged in the distribution of security and fire protection equipment to wholesale customers for professional installation.

38.     Notably, Honeywell had just reorganized HBT in the third quarter of 2016 in order to isolate underperforming disparate HBT businesses under one umbrella (which became the Homes division) while consolidating the lucrative businesses under the HBT Buildings umbrella (which Honeywell retained).  Honeywell's management thus  created HBT Homes  just prior to spinning it off as a standalone publicly-traded company (that would become Resideo).

39.     Around the same time, Third Point, the activist hedge fund headed by Daniel S. Loeb, purchased a large position in Honeywell stock and in a series of meetings with Honeywell's CEO Adamczyk, urged Honeywell to Spin-Off its aerospace division to accelerate growth and create value for Honeywell's shareholders.

40.     In response, through a series of meetings with Third Point, Honeywell's management indicated they wanted to keep the aerospace business, but instead proposed the Spin-Off of Honeywell's homes and transportation business segments in to two separate publicly traded companies (what would become Resideo and Garrett Motion,

Inc.).

41.     On October 10, 2017, Honeywell announced its intention to Spin-Off its Honeywell Homes and ADI global distribution business into a stand-alone, publicly-traded company that would become Resideo.  At the time, Honeywell CEO Darius Adamczyk stated that the Spin-Off would allow the businesses to be "better positioned to maximize shareowner value through focused strategic decision making and capital allocation tailored to their end markets."  In the presentation announcing the planned Spin-Off, Honeywell stated under the "Strategic Rationale For Separation" heading that the Spin-Off would provide "More Opportunities To Grow Inorganically Through Targeted Capital Allocation [] Investment Optimization To Capture Evolving End Market Dynamics [] Improved Focus on B2C And Distribution Business Segments."

42.     By its own admission, the justification for the Spin-Off was in part "Recurring Payment[s] To Honeywell for Significant Portion Of Legacy Environmental Liabilities."  Honeywell further touted that the Spin-Off would "Unlock [] Significant Value for [Honeywell] Shareholders" including "Prudent Legacy Liability Funding Based On [Resideo's] Cash Flows."

43.     Honeywell's management viewed the Spin-Off of Honeywell's homes business as a means of blunting the activist threat posed by Third Point, while also enriching Honeywell's business by allowing it to escape the lion's share of the Legacy Environmental Liabilities and effectively transfer these onto Resideo's balance sheet.

44.     With Third Point's blessing, Honeywell's management embarked on the scheme to offload Honeywell's Legacy Environmental Liabilities as follows.   First,

Honeywell chose an underperforming business segment within its HBT division – the $4.5 billion Homes business –which, as stated above, had just been reorganized in order to isolate and consolidate various underperforming HBT businesses under the Homes umbrella.

45.     Second, Honeywell's management took steps to control every aspect of the Spin-Off to ensure the success of offloading the Legacy Environmental Liabilities.  Indeed, after the Spin-Off was announced in October 2017, Honeywell's management installed Honeywell's own Assistant General Counsel and Assistant Corporate Secretary Jacqueline Katzel as Resideo's President, and then Honeywell – along with their lawyers at Cleary Gottlieb– exerted unilateral control over negotiating the terms of the Separation and Distribution Agreement and the Indemnification and Reimbursement Agreement, which was signed by Honeywell Assistant General Counsel Katzel on Resideo's behalf.

46.     Thus, on October 14, 2018, Resideo entered into an Indemnification and Reimbursement Agreement with Honeywell purporting to cover the Legacy Environmental Liabilities.  Among other things, the Indemnification Agreement obligates Resideo to remit cash payments to Honeywell for 90% of amounts billed related to: (i) environmental claims; (ii) environmental remediation; (iii) hazardous exposure; and (iv) toxic tort claims, including consequential damages, net of 90% of Honeywell's insurance receipts and/or proceeds received through affirmative claims against third parties.  The Indemnification Agreement caps the amount payable to Honeywell at $140 million per year and continues until the earlier of 2043, or if the amount payable falls below $25 million per year for three consecutive years.

47.    The result of Honeywell's conflicted negotiation of the Spin-Off was a lopsided transaction in which Honeywell forced upon Resideo a disproportionate allocation of debt in the form of the Legacy Environmental Liabilities.  The Spin-Off also consisted of random Honeywell businesses that were beset with supply chain issues driven by industry-wide declines and corporate governance issues, while Honeywell emerged as a "clean" former parent washed of liabilities.[1]

48.    In light of Honeywell's reported Legacy Environmental Liabilities of $200 million in 2017, $221 million in 2016 and $259 million in 2015, and negligible offsetting insurance proceeds (ranging from $2 million to $18 million), Resideo will likely meet the $140 million cap for the foreseeable future, significantly hampering Resideo's ability to operate and expand its business.

49.    To add insult to injury, in connection with the Spin-Off, Honeywell also caused Resideo to assume $1.2 billion in debt and used the proceeds of that debt to authorize a $1.2 billion dividend payment back to Honeywell.

50.    Honeywell also forced upon Resideo a 40-year trademark licensing agreement under which Resideo must pay millions of dollars in royalties to Honeywell to use the to use the "Honeywell Home" brand.

51.    Both the Indemnification Agreement and the trademark licensing agreement were executed by Honeywell's Assistant General Counsel Katzel purportedly on Resideo's

---

[1] While Honeywell still records accruals for environmental matters deemed probable and reasonably estimable related to the Legacy Environmental Liabilities on its own balance sheet, it offsets this accrual by simultaneously recording a corresponding receivable from Resideo for 90% of this amount.

17

behalf.  Moreover, the agreement governing the credit facilities which Resideo had used to pay Honeywell the $1.2 billion dividend was negotiated while Honeywell still exercised control over the Company.

**B.      Resideo Touts the Success of the Spin-Off and Deflects Early Concerns About Supply Chain Issues**

52.      Resideo and its management touted the success of the Company as a foregone conclusion prior to the effective date of the Spin-Off.  For example, an October 10, 2018 press release issued by the Company stated:  "Resideo begins with an enviable market position, as a $4.7 billion business with a global addressable market of more than $35 billion that continues to grow thanks to favorable trends and consumer preferences. Our diversified revenue streams, strong segment profits and limited capital expenditure needs are just a few of the reasons Resideo has a bright future."  CEO Nefkens doubled down on this rosy characterization the next day, stating "I'm quite optimistic about our footprint and the ability to counter any trade issues . . . I'm now feeling very good about our footprint.  My competitors right now are the ones that are concerned."

53.      These and other statements issued by Resideo and Honeywell in the weeks leading up to the Spin-Off were not extemporaneous, but deliberately calculated to prime the market and to avoid a massive stock sell-off on the first day of trading after the Spin-Off.

54.      Honeywell completed the Spin-Off of Resideo on October 29, 2018.  On that date, Honeywell's shareholders received one share of Resideo stock for every six shares of Honeywell stock owned on the Record Date.  Honeywell distributed approximately 123

million shares of Resideo common stock in the distribution and did not retain an ownership interest in the spun-off Company.

55.     After the Spin-Off, Resideo was comprised of two business units:  (1) residential comfort and security solutions ("Products"); and (2) wholesale distribution of security and low voltage fire protection products ("Distribution").

56.     Resideo's Products business is purportedly a leading provider of critical, residential comfort and security solutions serving mostly residential end markets. Resideo's Products are still marketed and sold under the Honeywell Home brand pursuant to the trademark licensing agreement discussed above.  The Products area of the Company is divided between solutions in Comfort & Care and Security & Safety.  Comfort & Care business is comprised of home products, services and technologies, including Temperature and Humidity Control Solutions; Thermal Solutions; Water Solutions; Air Solutions; and Remote Patient Monitoring Software Solutions (telehealth); and Software Solutions.

57.     The Security & Safety business includes professionally installed and monitored intrusion and life safety detection and alarm systems, as well as self-installed and self-monitored awareness solutions, including Security Panels; Sensors; Peripherals: Wires and Cables; Software Solutions; Communication Devices; Video Cameras; Awareness Solutions; Cloud Infrastructure; and Installation and Maintenance Tools.  The Products business maintains network of 110,000+ professional contractors, 3,000+ distributors, 1,200+ OEMs, major retailers and online merchants.

58.     Resideo's Distribution business, called ADI Global Distribution, is purportedly the leading wholesale distributor of security and low voltage electronics

products, which include security, safety, and audio-visual products and related accessories. ADI distributes third-party products including security products (video surveillance, intrusion systems, and access controls); fire and safety products; and wire, networking and professional audio-visual systems. The Distribution business has a customer base of 100,000+ contractors and operations across 17 countries.  It serves Resideo as an important channel to the market and provides insight to Resideo into current trends.

59.     Less than a month after it began trading, on November 8, 2018, Resideo issued a press release, which it also filed on Form 8-K, in which the Company announced it would be presenting at the Baird Global Industrial Conference in Chicago, Illinois.  In the presentation accompanying the press release, Resideo touted its "Mature, Integrated Supply Chain with Continued Application of Best-in-Class Honeywell Operating System" as follows:



60.    As indicated above, Resideo went to great lengths to trumpet its supposedly robust and efficient supply chain, stating the Honeywell Home Operating System (which became part of Resideo) supply chain was "strategically positioned in low cost regions that are located in or near key markets to reduce delivery time."

61.    Resideo also touted the Company's line of "connected" (*e.g.*, wireless) home products in the presentation.  For example, Resideo stated it was "uniquely positioned to benefit from growing demand for connected homes" and that it was a "Major Player in Connected Homes with [a] Growing Suite of Software Services."  Resideo also stated under the "Key Growth Drivers" heading that it had "Increasing penetration of connected systems."

62.    However, Resideo employees claim that, contrary to Resideo's public statements, it was well known that the Company had "**[o]utdated and poorly designed products, late to market**"[2] and that the ADI Global Distribution business was "**stuck in the past**, failing to address the global move to low margin Web based selling and manufacturers selling direct to larger companies."

63.    Employees also confirmed that after "too many years of neglect, outsourcing, brain drain" customers were "very uneasy about [Resideo] products" and that Resideo's management had instructed them to "lie by all means to the customers in order to prevent further escapes."

64.    Resideo's customers similarly confirmed that, in spite of the Company's

---

[2] All emphasis added unless otherwise indicated.

public statements, "*[Resideo] is widely viewed externally as a company that at one time owned the security and thermostat space but never adapted of innovated and was left behind long ago as the connected home became more wide spread*."

65.     On November 9, 2018, Resideo issued a press release announcing its third quarter 2018 financial results.   The press release quoted Nefkens as saying:   "Our performance as part of Honeywell over the past three years demonstrates a well-run business that is on-track to deliver continued growth in 2018 and beyond" and stated that Resideo's management had a "clear vision to deliver our next generation growth plan for Resideo."

66.     Significantly, the press release stated that while "Products segment performance was impacted by temporary supply chain issues," Resideo was "actively resolving" those issues.

67.     Resideo's management reiterated this position on the conference call with analysts the next day, November 14, 2018, representing that "*with the spin behind us*, operationally, our team is focused and back on track."   Also on the call, Nefkens assured investors that Resideo was "actively addressing [] supply chain issues" and "already seeing product flows moving back towards normal volumes."

68.     Also on the earnings call, Nefkens discussed supposedly strong demand for Resideo's connected home products, stating:   "We see strong drivers for demand, which we expect to continue from the growing demand for and adaptation of smart and connected devices combined with the growing need for expertise to really help people make sense of these technologies and access them more easily.   Our business is performing well.   And we

expect the powerful combination of scale, steady growth and market position will give us margin expansion and significant equity valuation uplift going forward."

69.     When asked about the supply chain issues, Nefkens responded by stating: "most of them, believe it or not, are administrative items" and that "these are just items that we knew were in front of us.  We planned for it.  In Q4, I can tell you right now we're already seeing volumes coming back to normal."

70.     Nefkens then reiterated that "we'll be fully back and running here by Q1 [2019].  Again, the reason that we're able to affirm our guidance at the top end of the range is because we're already working through these items and we're very comfortable that we're on the other side of it now."

71.     On December 12, 2018, at the Imperial Capital Security Investor Conference in New York, Defendant Ragan emphasized the Company's supposed supply chain efficiency, stating:   "We have done a significant amount of work on the factory rationalization.  10 years ago, there were 50 factories and somehow Michael got from 50 to 18 and doubled the revenue, which is spectacular . . . the company is incredibly efficient from a manufacturing supply chain perspective."

**C.     Despite Lowering 2019 Full Year Guidance, Resideo Falsely Assures Investors the Company's Supply Chain Issues Are Resolved and the Company is at a "Strategic Inflection Point"**

72.     On March 7, 2019, Resideo announced its fourth quarter and full year 2018 financial results.  The press release announcing the results quoted Nefkens as saying:  "we successfully executed the spin and met or exceeded financial expectations.  The disruption from the spin is mostly behind us."

23

73.     Resideo simultaneously announced lowered 2019 revenue guidance from 4% to 2-5% and projected EBITDA in the range of $410 to $430 million.

74.     On the conference call held later that day to discuss the results, in response to an analyst question, Nefkens stated:  "As you guys know with a spin, this effectively is the first time that we are having all of our costs under our control.  So there's a lot in there. And we are at a strategic inflection point.  I would tell you that we are at or ahead of where I expected to be."

75.     In response to Resideo's lowered guidance, the Company's stock price declined $5.79 per share that day.

**D.     Resideo's Management Continues to Tout the Success of the Spin-Off and Characterizes the Decline in RTS Performance as Temporary**

76.     In spite of Resideo's previously announced lowered guidance for 2019 and the attendant stock drop, Resideo continued to tout the efficiency of its supply chain as well as the high-margin RTS business.

77.     For example, on a May 9, 2019 conference call held to discuss first quarter financial results, Nefkens stated that the "Product segment also saw tangible improvement in supply chain execution as we work through Spin-related headwinds from the past two quarters."

78.     In the presentation accompanying the conference call, Resideo touted "Improvement in supply chain execution" among its "Key Highlights" for the quarter.

79.     Also on the call, regarding the Company's RTS business, Nefkens stated that Resideo had a "strong and leading market position" and was "growing well above market."

80.     Finally, Nefkens reaffirmed growth guidance in the upper end of EBITDA projections.

81.     Then, at the Baird Global Consumer, Technology & Services Conference held on June 6, 2019, Defendant Ragan stated that Resideo "continues to take share there" and it has a "compelling position in the nonconnected space."   Ragan further touted Resideo's RTS business and explained the recent decline in the RTS business stating "comps year-over-year were tough" and "so the comps don't look as good as we would like" but then stated "that's really just a temporary issue."   In the corresponding presentation, Resideo again touted "Improvement in supply chain execution" as one of its "Key Highlights."

82.     In truth, Resideo did not have a "compelling position in the nonconnected space" or "continue to take share there."  As claimed by employees, Resideo had "Outdated and poorly designed products" that were "late to market" and that the Company was "stuck in the past."   Resideo had also instructed Company employees to "lie by all means to the customers in order to prevent further escapes."

83.     Resideo's own wholesale customers claimed that, contrary to Defendants' statements that the Company occupied a "compelling position in the nonconnected space," "*[Resideo] is widely viewed externally as a company that at one time owned the security and thermostat space but never adapted or innovated and was left behind long ago as the connected home became more wide spread*."

84.     Resideo's customers likewise had a negative response to a product showcase held by Resideo's senior management to demonstrate the Company's new products.  After

the presentation, a Resideo employee stated that "*[c]ustomers big and small are saying it made them actually feel worse about the Company and its products*. Off the record comments like 'it validates what we thought, that all you have is the old products nothing really new or innovative planned.' *They also kept focusing on the fact we talked about software and had screenshots but didn't demo any (because none of it works)*."

### E.    Resideo Initiates a Comprehensive Operational and Financial Review and is Forced to Admit a Slowdown in the RTS and Comfort Businesses

85.    Finally, in the October 22, 2019 press release announcing its third quarter 2019 financial results, Resideo disclosed it would be performing a full financial and operational review of its business:

> Resideo has begun a comprehensive operational and financial review, focused on improving gross margins and optimizing its organizational footprint. The aim of the review is to simplify internal processes that will enable Resideo to be more agile in responding to changing customer and marketplace dynamics. The company has retained industry-recognized experts in supply chain optimization and organizational excellence to assist in the review.

86.    Simultaneously with the disclosure that the Company would initiate a comprehensive financial review, Resideo announced the surprise departure of its CFO Defendant Ragan.

87.    Resideo further disclosed that its Products segment experienced revenue decline due in part to a slowdown in the RTS business which was "driven by certain recent regulatory changes and a general slowdown across large OEM customers in the sector."

88.    Resideo also announced a decline in the Comfort business "primarily due to

26

lower sales volumes in non-connected thermostats."  Significantly, Resideo admitted that "poor pre-spin cutover from the prior generation of non-connected thermostats to the T-Series line impacted the adoption of mid-level T-Series thermostats" and that "the cutover effects became markedly more pronounced in the third quarter after the prior generation of non-connected thermostats were discontinued."

89.     On this news, the price of Resideo's common stock declined more than 37%, from a close of $15.23 per share on October 22, 2019 to a close of $9.50 per share on October 23, 2019, on a volume of more than 16 million shares.

### F.     Post-Class Period Developments

90.     On December 2, 2019 – less than two months after the departure of Resideo's CFO and in the midst of a financial and operational review – Resideo announced the departure of CEO Nefkens to "focus on family health issues."

91.     On December 11, 2019, Resideo released an "Investor Update" presentation in advance of the Imperial Capital 2019 Security Investor Conference.  In the presentation, Resideo admitted that "SpinCos often have teething pains due to legacy tie-ins, allocated pre-spin financials, management and customer turnover, TSA transitions and shareholder churn."  The presentation further admitted the Resideo spin-off had "additional complexity due to Honeywell determined spin obligations, lack of pre-existing stand-alone business and dramatic profitability shortfalls to estimates."

92.     In an investor call held the next day, Resideo's new CFO Robert Ryder stated "Resideo had additional complexity [] due to the Honeywell determined spin obligations" Ryder went on to say that a major complication for the Company was that before the spin,

Resideo lacked a "pre-existing stand-alone business . . . essentially the whole products and solutions business was various businesses within divisions of Honeywell and they kind of picked individual pieces up and kind of threw them together and called that products and solutions, which we'll talk about, and that kind of has some governance ramifications I'd say."

93.     Put another way, Ryder admitted that Resideo was a hodgepodge of individual Honeywell business units with no prior connection to each other that had never existed as a stand-alone operating unit of Honeywell.

94.     As a result, the financial projections Defendants issued at the time of the spin-off – which aggregated the projections of the random Honeywell business units that would become Resideo – lacked a reasonable basis, in light of Resideo's lack of operating history and revenues as a single pre-spin business unit of Honeywell.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

95.     Prior to and during the Class Period, Defendants made numerous materially false and misleading statements concerning Resideo's business that omitted:  (i) one of the two business segments that would comprise Resideo – Products & Solutions – had been thrown together piecemeal by Honeywell from underperforming and unrelated products within the HBT division; (ii) the products that would comprise the Products & Solutions division did not have historic separate P&Ls as stand-alone business units, independent governance or operational structures; (iii) the products that would comprise the Products & Solutions division had severe undisclosed product, supply chain and governance

problems; and (iv) because the Products & Solutions division was composed of products thrown together by Honeywell without regard to how they would be integrated to operate as a stand-alone Company, Defendants had no reasonable basis for the earnings guidance issued before and during the Class Period.

### A.   Honeywell's False and Misleading Statements Prior to the Spin-Off

96.   On August 23, 2018, Honeywell published on its investor relations website a presentation entitled "Resideo Fact Sheet" containing a number of false and misleading misstatements about Honeywell's planned Spin-Off of the Company.  Among other things, the presentation touted Resideo's "Competitive Strengths" as follows:

- "Diversified revenue streams, strong segment profits and limited capital expenditures";

- "Agility and speed to market needed to move in a growing industry"; and

- "strong management operating system and attractive financial profile."

97.   Also in the presentation, Honeywell represented under the heading "Company Snapshot" that Resideo would be the:

- "Leading global provider of critical comfort and security solutions, primarily in residential environments";

- "Leading global wholesale distributor of security and low voltage products"; and

- Provider of "Innovative solutions protected by broad intellectual property portfolio."

98.   The presentation further touted that Resideo's Honeywell Homes division would provide "innovative, end-to-end solutions" that represented a "growing portfolio of connected home solutions" that was "one of the largest and most comprehensive in the

market."

99.    Under the "2017 Key Financials" heading, Honeywell touted the financial performance of the HBT and ADI divisions that would comprise Resideo.  In this regard, Honeywell claimed that Resideo had a Global Addressable Market of $15 billion in Products and $20 billion in ADI Global Distribution.

100.    The presentation further stated that Resideo would be "established with sound capital structure in order to fund Resideo working capital and other immediate cash needs" and that "Resideo anticipates paying cash dividends on its common stock."

101.    Finally, regarding the Indemnification Agreement, Honeywell represented that the "indemnity structure allows continued effective management of claims by Honeywell and the cap mitigates future uncertainty for Resideo management and shareowners."

102.    The statements set forth in ¶¶ 96-101 above were materially false and misleading and omitted material facts because, in truth, one of the two business segments that would comprise Resideo, the Products & Solutions division, had been thrown together piecemeal by Honeywell from unrelated parts, did not have historic separate P&Ls as a stand-alone business or independent governance and operational structures, contained severe undisclosed product, supply chain and governance problems.

103.    Consequently, Honeywell had no reasonable basis to claim that Resideo would have "Diversified revenue streams, strong segment profits and limited capital expenditures."  Honeywell's claim that Resideo's Products division would have a total addressable market of $15 billion was materially misleading because it gave the appearance

that the business units in the Products division had a history of performance as a single unit, when in fact it was comprised of random business units with no prior operational relationship.

104.    In the October 10, 2017 press release announcing the Spin-Off, Honeywell CEO Darius Adamczyk stated the "new Homes and Global Distribution business will be a leader in the home heating, ventilation and air conditioning (HVAC) controls and security markets, and a leading global distributor of security and fire protection products. The business is expected to have annualized revenue of approximately $4.5 billion, a high-yield credit rating, approximately 13,000 employees, and financial responsibility for certain Honeywell legacy liabilities."  Moreover, the Honeywell investor presentation announcing the Spin-Off touted what would become Resideo as a "Great Business" as follows:



105.    On January 26, 2018, Honeywell conducted an earnings call to discuss its

31

fourth quarter 2017 financial results.  In response to an analyst question concerning the

progress of the planned Spin-Offs, Adamczyk stated:

> [W]e view these as our businesses before and after the spin. I
> mean, I think we want to make sure that these are incredibly
> successful. We have very focused management teams in both
> the spins businesses. They're doing a great job in running their
> businesses, but also getting ready for the spins. I'm very
> confident that the teams in those businesses are focused on
> delivering now and after the spins take place. So, I think there's
> also proper incentives that are aligned to the success before and
> after the spin as well, which we've taken care of and put in
> place.

106.    Also on the call, Honeywell's then-CFO Thomas A. Szlosek

stated:

> this is not an effort that's being done in some far-flung part of
> the company.  The team, the SpinCo team, that's executing on
> the transactions actually reports into Darius and I directly. We
> do involve the businesses being spun but we want them
> focused, for the most part, on executing on their operating
> plans and that's the way we've structured it. The two objectives
> of the spin team are one, day one readiness for those
> organizations, and we have a very strong cadence and
> operating system around that in terms of systems, in terms of
> people and staffing and doing all the regulatory filings and so
> forth. So, that's very rigorous.
>
> Secondly, it's stranded costs, and with 20% of the revenues
> from the RemainCo going with the spin, we need to right-size
> the company. And so, that SpinCo leadership team also is in
> the process of managing that cost structure. So, Darius and I
> get regular weekly visibility to it. We've put on some of the
> most senior people in Honeywell to do this, and we're
> encouraged by the progress we're making.

107.    In Honeywell's August 23, 2018 Investor Presentation providing an update

on the Garrett and Resideo Spin-Offs.  Presentation stated "Garrett and Resideo will be

established with sound capital structures" and "Honeywell, Garrett and Resideo are well-positioned for strong futures."

108.    On September 6, 2018, Honeywell's CEO Adamczyk was interviewed by Jim Cramer on CNBC's *Mad Money* concerning the Spin-Offs of Resideo and Garrett Motion.  During the interview, Adamczyk stated:

- "what defines a Honeywell business [] there are a couple businesses that frankly were ***terrific businesses***, Garrett and Resideo, but frankly, they didn't fit the Honeywell profile";

- "[Garrett Motion and Resideo are] ***terrific franchises that have performed exceptionally well***";

- Resideo has a "huge install base, its present in millions upon millions of homes, have a great strategy around a connected home, a one-stop shop solution, and a great distribution, a low voltage distribution, called ADI to go with it."

109.    The statements set forth in ¶¶ 96-101, 103-108 above were materially false and misleading when made because they gave the false appearance that Resideo was comprised of cohesive stand-alone business units with historic separate P&Ls and operational structures when, in truth, the Products & Solutions division had been thrown together piecemeal by Honeywell from unrelated parts, did not have historic separate P&Ls as a stand-alone business or independent governance and operational structures.

110.    Indeed, contrary to Honeywell's statements, Resideo – including its Products & Solutions division – was not a "terrific business[]" or a "terrific franchise[] that [had] performed exceptionally well," but was a collection of products from various business units with no prior operating history or historic P&Ls as a stand-alone business.

111.    Consequently, Honeywell's statements concerning Resideo's business

33

prospects and outlook – which relied on the false premise that Resideo's Products & Solutions division operated as a stand-alone business with a single operating history – lacked a reasonable basis when made.

112.    The statements set forth above were further materially false and misleading when made because, unknown to investors, Honeywell retained lucrative HBT business units and offloaded underperforming HBT units that suffered from severe undisclosed products, supply chain and governance problems.

**B.    Resideo's False and Misleading Statements Prior to the Spin-Off**

113.    On October 2, 2018, Resideo filed an amended Registration Statement on Form 10 in connection with the Spin-Off from Honeywell.  The Registration Statement included a description of Resideo's business operations, the reasons for the Spin-Off, and consolidated financials for the business segments that would become Resideo.

114.    Specifically, the Registration Statement stated one of Honeywell's key reasons for the spin-off was "that the Spin-Off is the most attractive alternative for enhancing stockholder value" and that following the spin-off Honeywell and Resideo would "be better able to execute on each company's specific strategic plans."

115.    The Registration Statement represented that Resideo was the "global leader in professionally installed residential comfort and security and the leading global wholesale distributor of security and low voltage products" and that Resideo's products "benefit from the trusted, well-established Honeywell brand."   The Registration Statement further discussed Resideo's plans to "expand and market our extensive portfolio and distribution base" using its "long-standing, mutually beneficial relationships with professional

contractors and OEM channels as a key differentiator."

116.    Each of the statements in ¶¶ 113-115 above were materially false and misleading when made because they gave the false appearance that Resideo was comprised of cohesive stand-alone business units with historic separate P&Ls and operational structures when, in truth, the Products & Solutions division had been thrown together piecemeal by Honeywell from unrelated parts, did not have historic separate P&Ls as a stand-alone business or independent governance and operational structures.

117.    On October 10, 2018, Resideo issued a press release, which it also filed with the SEC on Form 8-K, stating that "Resideo begins with an enviable market position, as a $4.7 billion business with a global addressable market of more than $35 billion that continues to grow thanks to favorable trends and consumer preferences. Our diversified revenue streams, strong segment profits and limited capital expenditure needs are just a few of the reasons Resideo has a bright future."

118.    Also on October 10, 2018, the Company held its first Investor Showcase and Technology Demonstration.    The slide presentation published in advance of the demonstration represented that in 2019 Resideo was "looking at revenue growth, organic revenue growth, at 4%" as well as adjusted EBITDA margin of 13% pre-indemnity and post-indemnity 10% adjusted EBITDA margin.

119.    On October 11, 2018, CEO Nefkens discussed Resideo's business in a telephone interview with *TheStreet*.  On the call, Nefkens stated "I'm quite optimistic about our footprint and the ability to counter any trade issues" and that "we manufacture close to our customers . . . Most of our competitors manufacture in China.  So, the reality is when

[the U.S.-Mexico-Canada Agreement] got ratifies a week or two ago, I'm now feeling very good about our footprint.  My competitors right now are the ones that are concerned."

120.    The statements in ¶¶ 117-119 above were materially false and misleading when made because, among other things:  (i) one of the two business segments that would comprise Resideo – Products & Solutions – had been thrown together piecemeal by Honeywell from underperforming and unrelated products within the HBT division; (ii) the products that would comprise the Products & Solutions division did not have historic separate P&Ls as stand-alone business units, independent governance or operational structures; (iii) the products that would comprise the Products & Solutions division had severe undisclosed product, supply chain and governance problems; and (iv) because the Products & Solutions division was composed of products thrown together by Honeywell without regard to how they would be integrated to operate as a stand-alone Company, Defendants had no reasonable basis for the earnings guidance issued before and during the Class Period.

### C.    Defendants' False and Misleading Statements in 2018

121.    On October 30, 2018, the Company issued a press release announcing the completion of the Spin-Off and that it was now trading independently from Honeywell.

122.    On November 8, 2018, Resideo issued a press release, which it also filed on Form 8-K, announcing that the Company's management would present at the Robert W. Baird Global Industrial Conference in Chicago, Illinois.   In the November 2018 presentation attached to the same Form 8-K, Resideo touted its "Strong Operational and Financial Performance With Consistent Growth and Margin Performance" and its "Mature, Integrated Supply Chain with Continued Application of Best-in-Class Honeywell

Operating System."

123.     The statements set forth in ¶¶ 121-122 above were materially false and misleading when made because, among other things:  (i) one of the two business segments that would comprise Resideo – Products & Solutions – had been thrown together piecemeal by Honeywell from underperforming and unrelated products within the HBT division; (ii) the products that would comprise the Products & Solutions division did not have historic separate P&Ls as stand-alone business units, independent governance or operational structures; and (iii) the products that would comprise the Products & Solutions division had severe undisclosed product, supply chain and governance problems.

124.     On November 13, 2018, Resideo issued a press release announcing its third quarter 2018 financial results in which Nefkens was quoted as saying:  "Our performance as part of Honeywell over the past three years demonstrates a well-run business that is on-track to deliver continued growth in 2018 and beyond" and that the Company had a "clear vision to deliver on our next generation growth plan for Resideo."  Additionally, Resideo reiterated that for full-year 2019, it was expecting "4 percent organic revenue growth [and an] adjusted EBITA margin of 13 percent."

125.     In addition to being false and misleading for the reasons stated in ¶123 above, Defendants' statement reaffirming EBITDA guidance was misleading because, as the Products & Solutions division was composed of products thrown together by Honeywell without regard to how they would be integrated to operate as a stand-alone Company, Defendants had no reasonable basis to claim an adjusted EBITDA margin of 13 percent.

126.     In the same press release, Resideo stated that the "Products segment

37

performance was impacted by temporary supply chain issues" but that the Company was "actively resolving" those issues.

127.    During the related earnings call on November 14, 2018, Nefkens stated that "**with the spin behind us**, operationally, our team is focused and back on track" and reiterated that the Company was "actively addressing [] supply-chain issues, and [] already seeing product flows moving back towards normal volumes."

128.    Also on the call, Nefkens specifically highlighted increasing demand for Resideo's connected products, stating:  "We see strong drivers for demand, which we expect to continue from the growing demand for and adaptation of smart and connected devices combined with the growing need for expertise to really help people make sense of these technologies and access them more easily. Our business is performing well. And we expect the powerful combination of scale, steady growth and market position will give us margin expansion and significant equity valuation uplift going forward."

129.    Following their prepared remarks, defendants Nefkens and Ragan answered questions from analysts, stating that pre-spin supply chain issues were merely administrative and that volume sales were already getting back to normal. According to the Company, defendants were in a position to reaffirm guidance because of this return to normalcy:

> [Analyst:]  So just to start off, can you guys provide any additional insight on the 1% growth you saw in products this quarter?  Maybe give a – If you could  give a big help of how much of the growth was really impacted by spin-related supply chain noise in the quarter.  And then going forward, what do you view as a normalized growth rate and how quickly can you get there?
>
> [Nefkens:] Yes. Great, Mark, thanks for the question. So yes,

so *I'll talk a little bit about the spin-related supply chain issues that we put out there because it did affect us in Q3, as expected*. I talked about these at Investor Day. Typically, what they are, are items – I'll just give you a really good example, *like most of them, believe it or not, are administrative items*. We had an example of customs-related issues where paperwork comes in under the Honeywell name, product news to actually be – come out under the Resideo name. Took a couple of days to do that. We also have some plant shifts that we're making in Europe as a result of the spin. So these are just items that we knew were in front of us. *We planned for it. In Q4, I can tell you right now we're already seeing volumes coming back to normal.* And I told the team and we're still looking out, there's still a few things we've got to make sure come through before we get clean. So I would tell you we're still seeing a few of those headwinds here in Q4, as expected. *And we'll be fully back and running* here *by Q1. Again, the reason that we're able to affirm our guidance at the top end of the range is because we're already working through these items and we're very comfortable that we're on the other side of it now.*

130.   The statements set forth in ¶¶ 121-122, 124, 126-129 above were materially false and misleading when made because, among other things:  (i) one of the two business segments that would comprise Resideo – Products & Solutions – had been thrown together piecemeal by Honeywell from underperforming and unrelated products within the HBT division; (ii) the products that would comprise the Products & Solutions division did not have historic separate P&Ls as stand-alone business units, independent governance or operational structures; (iii) the products that would comprise the Products & Solutions division had severe undisclosed product, supply chain and governance problems; and (iv) because the Products & Solutions division was composed of products thrown together by Honeywell without regard to how they would be integrated to operate as a stand-alone Company, Defendants had no reasonable basis for the earnings guidance issued before and

during the Class Period.

131.    The above statements were also false and misleading when made because: (i) the spin-off issues were not "behind" the Company and Resideo was not "already seeing volumes coming back to normal;" and (ii) Resideo had no reasonable basis to re-affirm financial guidance at the top end of the range because, as later revealed, it was not "fully back and running" and "on the other side" of the supply chain issues.

132.    Resideo's then-CFO Ragan presented at the Imperial Capital Security Investor Conference in New York on December 12, 2018.  At the conference, Ragan said "We have done a significant amount of work on the factory rationalization.  10 years ago, there were 50 factories and somehow Michael got from 50 to 18 and doubled revenue, which is spectacular . . . the company is incredibly efficient from a manufacturing supply chain perspective."

133.    The statement in ⁋ 132 above was knowingly false when made.  As later revealed by CFO Ryder:  "***We probably have too many [products], we might be in too many places, maybe our manufacturing facilities aren't in the right places with the right freight lines, maybe capacity utilization isn't where we would want to be***."

### D.    Defendants' False and Misleading Statements During 2019

134.    On March 7, 2019, Resideo reported its fourth quarter and full year 2018 results.  The press release announcing the results stated that Resideo delivered "results at high end of range" and quoted Nefkens as saying "we successfully executed the spin and met or exceeded financial expectations.  ***The disruption from the spin is mostly behind us and we have a solid team in place that delivered great results in 2018*.**"

40

135.    Under the Financial Performance heading of the press release, Resideo reported that Products & Solutions profit decreased 20 percent "impacted by one-time spin-related costs."

136.    Despite Nefkens' representations to investors that Resideo's spin was successful and any related disruption was resolved, the same press release lowered revenue guidance for 2019 from Resideo's previous guidance of 4% to 2-5%, and projected EBITDA for 2019 in the range of $410 to $430 million.  In response, Resideo's stock price declined more than 23%, or $5.79 a share.   However, the Company and Individual Defendants continued to mislead investors.

137.    For example, on the conference call held the same day to discuss Resideo's fourth quarter and full year 2018 financial results, Nefkens told investors:

- "I also feel really good that most of the disruption from the spin is now behind us";

- "As I've shares in the past, this is my third spin, and we are on schedule, and in some cases, ahead of schedule, when I compare to previous spins I've been a part of";

- "While our spin-related cost base came in higher than expected and put some downward pressure on our near-term EBITDA, we are already taking action to optimize the cost base and operating footprint we inherited from the spin"; and

- "we came out of the spin on time and delivered on the high end of the range for 2018."

138.    In response to an analyst question about the lowered revenue guidance, Nefkens responded:

As you guys know with a spin, this effectively is the first time that we are having all of our costs under our control [] we are

at a strategic inflection point.  I would tell you that we are at or ahead of where I expected to be.

139.   The statements set for in ¶¶ 134-138 above were materially false and misleading when made because, rather than being temporary spin-related issues, as later revealed, Resideo was plagued with undisclosed product, supply chain and governance problems because the business had been thrown together piecemeal by Honeywell from underperforming and unrelated products within the HBT division with no historic separate P&Ls as stand-alone business units, independent governance or operational structures.

140.   As later revealed by Resideo's replacement CFO Mr. Ryder, Resideo's problems were not one-time spin related issues, but a result of the Company having "too many [products]" in "too many places" and that Resideo's "manufacturing facilities aren't in the right places with the right freight lines" and "capacity utilization isn't where we want to be."

141.   Similarly misleading was Resideo's lowered EBITDA guidance:  because the Products & Solutions division was composed of products thrown together by Honeywell without regard to how they would be integrated to operate as a stand-alone Company, Defendants had no reasonable basis for the revised revenue guidance or lowered EBITDA.

142.   On May 8, 2019, Resideo issued a press release announcing its first quarter 2019 results.  In that press release, the company stated, "[w]ith continued confidence in our ability to execute and positive first-quarter results, we are reiterating our full-year 2019 guidance to reflect revenue growth of 2-5% and Adjusted EBITDA at the upper end of the

range of $410 to $430 million."

143.    Resideo's re-affirmance of full-year 2019 guidance was false and misleading for the reasons described in ¶141 above.

144.    The press release further stated that Resideo was "off to a great start in 2019 with strong Q1 revenue performance in both our Global Distribution and Products & Solutions businesses."

145.    Regarding Product & Solutions revenue, Resideo announced its new Honeywell Home T-Series Smart Thermostat lineup including the T9 and T10 Pro stating Q1 "was a strong quarter for Products & Solutions, demonstrating both core business innovation and global growth."

146.    The press release further stated under the heading Guidance and Cash Flow Generation that Resideo was "on track with our previously announced cost reduction program and expect $50 million in annualized savings by 2020.  With continued confidence in our ability to execute and positive first-quarter results, we are reiterating our full-year 2019 guidance to reflect revenue growth of 2-5%, and Adjusted EBITDA at the upper end of range of $410 to $430 million."

147.    On May 9, 2019, Resideo held a conference call to discuss its first quarter 2019 financial results.  On the call, Nefkens represented to investors that Resideo was seeing continued improvements in the previously-announced supply chain issues related to the Spin-Off and reiterated the Company's revenue guidance.  Specifically, Nefkens stated that Resideo's Comfort business "saw tangible improvement in supply chain execution as we work through spin-related headwinds from the past 2 quarters" and that the Company's

RTS business had a "strong and leading market position and [is] growing well above market."  Nefkens further stated that "for 2019, we're confident in our growth guidance in the upper end of our EBITDA guidance, and we remain optimistic."

148.    On June 6, 2019, Ragan presented at the Robert W. Baird Global Consumer, Technology & Services Conference.  During the presentation, Ragan stated that Resideo "continue[s] to take share there" and it has a "compelling position in the nonconnected space."  Ragan further stated regarding the decline in the RTS business that "comps year-over-year were tough" and "so the comps don't look as good as we would like" but assured investors that "that's really just a temporary issue."

149.    On August 7, 2019, the Company issued a press release announcing its financial results for the second quarter of 2019 which reiterated its previous full-year 2019 guidance for revenue growth of 2-5% and upper end of the Adjusted EBITDA range of $410 - $430 million.   Additionally, Nefkens indicated that Resideo's "momentum continues."

150.    The next day, the Company held a conference call for analysts and investors to discuss the results. The call was hosted by defendants Nefkens and Ragan, who emphasized that the effects of the Spin-Off were minimizing and that the Company had achieved its best supply chain performance in years.  Nefkens stated "*[w]e are finally starting to see some normalcy after all the spin work* . . . *spin-related distractions are minimizing.*"  Nefkens specifically highlighted the progress of Resideo's supply chain improvements:

> As you may know, we had some supply chain headwinds pre-

and post-spin. But due to new supply chain leadership and process changes, we're delivering more on time than ever before and our delivery metrics are the best they've been in 5 years.

151.   Also during the call, when discussing the Company's RTS business, Nefkens stated that while there was a "slowdown in the OEM segment" and Resideo was "adjusting the market growth of the RTS segment down to reflect changes in the market," he reassured investors that "[e]ven though the market has slowed we continued to win in that segment" and "we have a solid market position [] and our objective is to further accelerate our growth in these segments."

152.   During that conference call Nefkens also reiterated that the Resideo was on track to meet its previous projections, stating "[b]ut most important, our Q2 was strong, keeping us on track to hit our previously provided guidance for 2019."

153.   The statements set forth in ¶¶ 142-152 above were materially false and misleading when made because, among other things:  (i) one of the two business segments that would comprise Resideo – Products & Solutions – had been thrown together piecemeal by Honeywell from underperforming and unrelated products within the HBT division; (ii) the products that would comprise the Products & Solutions division did not have historic separate P&Ls as stand-alone business units, independent governance or operational structures; (iii) the products that would comprise the Products & Solutions division had severe undisclosed product, supply chain and governance problems; and (iv) because the Products & Solutions division was composed of products thrown together by Honeywell without regard to how they would be integrated to operate as a stand-alone Company,

Defendants had no reasonable basis Resideo's re-affirmation of 2019 full-year revenue guidance.

154.    The statements set forth in ¶¶ 142-152 above were also false and misleading because:  (i) in truth, Resideo continued to experience spin-related supply chain issues that were not returning the Company to "normalcy;" and, as later revealed by Mr. Ryder, Resideo had "***too many [products], [] in too many places, maybe our manufacturing facilities aren't in the right places with the right freight lines, maybe capacity utilization isn't where we would want to be***."

## VI.   THE TRUTH IS PARTIALLY DISCLOSED

155.    After market closed on October 22, 2019, Resideo issued a press release announcing its third quarter 2019 financial results in which the Company disclosed that the "Products & Solutions segment experienced revenue decline in certain product families of the Comfort business and in its Residential Thermal Solutions (RTS) gas combustion business."

156.    The press release further explained that "The Comfort business declines were primarily due to lower sales volumes in non-connected thermostats.  We believe a poor pre-spin cutover from the prior generation of non-connected thermostats to the T-Series line impacted the adoption of mid-level T-Series thermostats.  The cutover effects became markedly more pronounced in the third quarter after the prior generation of non-connected thermostats were discontinued."

157.    The Company further disclosed that with the transition to new connected thermostats and new generation security products, "with the transition, these products have

yet to benefit from the lifestyle value engineering, adversely impacting fully-year 2019 Products & Solutions segment gross margins.  The company is actively investing in its value engineering team and expects meaningful improvement to gross margins over the next 18 months."

158.    Also in the press release, Resideo disclosed third quarter EBITDA of $77-79 million, missing analyst expectations of $98-101 million.

159.    Resideo further reduced its full year 2019 EBITDA guidance to a range of $330-350 million, down from the $410-430 million previously given it had reaffirmed without qualification in numerous prior public statements.

160.    On the same day, Resideo announced the sudden departure of Defendant Ragan as CFO.

161.    These disclosures caused the price of Resideo common stock to decline from a close of $15.23 per share on October 22, 2019 to a close of $9.50 per share on October 23, 2019, wiping out $700 million in market capitalization.

## VII.    POST-CLASS PERIOD DEVELOPMENTS

162.    On December 11, 2019, Resideo's new CFO Ryder presented at an investor conference in which he made numerous statements revealing the Company's severe problems since inception – and indicating the falsity of Resideo's public statements during the Class Period.

163.    Among other things, Mr. Ryder stated that, contrary to Resideo's statements concerning the integration of business units and strong management, the Products & Solutions business was thrown together by Honeywell:

> A big thing was a lack of pre-existing standalone business . . . essentially the whole products and solutions business was various businesses within divisions of Honeywell and they kind of picked individual pieces up and kind of threw them together and call [sic] that products and solutions which we'll talk about, and that kind of has some governance ramifications.

164.    Mr. Ryder further revealed Resideo's prior statements concerning the Company's supposedly innovative products, streamlined manufacturing and robust supply chain were false when made:

> We probably have too many [products], we might be in too many places, maybe our manufacturing facilities aren't in the right places with the right freight lines, maybe capacity utilization isn't where we would want to be.
>
> *            *            *
>
> We're going to make some pretty sizeable reductions in [selling, general and administrative expenses] to right-size the business for what we think new sales will be when we eliminate some of the [products] and maybe look at some of the geographies and make sure we have the right [selling, general and administrative expenses], because all this stuff came over from Honeywell, and was probably structured for a much bigger, more complex business. Which we no longer have.  There is a lot of governance with a clear escalation path.

165.    Mr. Ryder's revelations exposed a reality at Resideo that is almost exactly the opposite of what Defendants said about the Company during and before the Class Period.  Mr. Ryder's statements make it clear that – far from the positive characterizations and projections for the newly spun-off Company – Defendants omitted that the processes for the Spin-Off and projections were flawed were the beginning.  Honeywell took a bunch of products from various business units that did not otherwise have historic-separate P&Ls as stand-alone businesses or independent governance and operational structures and just

assigned numbers to them without regard to how they would be integrated to operate as a stand-alone Company.

## VIII. ADDITIONAL ALLEGATIONS OF HONEYWELL'S CONTROL OVER RESIDEO

166.    By its own admission, Honeywell's management exercised unilateral control over the terms of the Spin-Off, and continued to represent to Honeywell shareholders that it exercised control over Resideo.  For example, in Honeywell's conference call held on January 26, 2018 to discuss fourth quarter and full year financial results for 2017, Honeywell's CEO Adamczyk stated:

> *[W]e view these as our businesses before and after the spin*. I mean, I think we want to make sure that these are incredibly successful. *We have very focused management teams in both the spins businesses.* They're doing a great job in running their businesses, but also getting ready for the spins. I'm very confident that the teams in those businesses are focused on delivering now and after the spins take place. So, I think there's also proper incentives that are aligned to the success before and after the spin as well, which *we've taken care of and put in place.*

167.    Also on the call, Szlosek admitted:

> [T]his is not an effort that's being done in some far-flung part of the company.  *The team, the SpinCo team, that's executing on the transactions actually reports into Darius and I directly*. We do involve the businesses being spun but we want them focused, for the most part, on executing on their operating plans and that's the way we've structured it. The two objectives of the spin team are one, day one readiness for those organizations, and we have a very strong cadence and operating system around that in terms of systems, in terms of people and staffing and doing all the regulatory filings and so forth. So, that's very rigorous.

168.    Szlosek further stated that Honeywell's management received "regular

weekly visibility" into the Spin-Off and that Honeywell had "put on some of the most senior people in Honeywell to do this."

## IX.   ADDITIONAL ALLEGATIONS OF SCIENTER

169.   As alleged herein, numerous facts collectively give rise to a strong inference that all Defendants acted with scienter in that they knew or disregarded with deliberate recklessness that the public documents and statements they issued and disseminated throughout the Class Period were materially incomplete, false and misleading, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements.  As set forth herein in detail throughout this Complaint, Defendants, by virtue of their receipt and knowledge of information reflecting the true facts regarding Resideo's operations and business, their control over, and/or receipt and/or modification of Honeywell's and Resideo's false and misleading misstatements and/or their positions within the Company which made them privy to confidential proprietary information concerning Resideo's operations, knowingly or recklessly participated in the fraudulent scheme alleged herein.

170.   Each of Honeywell, Nefkens and Ragan knew or recklessly disregarded that: (i) Honeywell spun-off Resideo as a pretext to offload the Legacy Environmental Liabilities and to rid itself of underperforming disparate business units; (ii) Honeywell retained lucrative HBT business units and offloaded underperforming HBT units; (iii) certain of Honeywell's products in the HBT unit would compete directly against Resideo's products, causing product cannibalization; and (iv) Resideo's business units were experiencing chronic supply chain issues driven by industry-wide declines prior to the

Spin-Off.

171.    Honeywell and Adamczyk were motivated to make the false and misleading statements identified herein to enable them to Spin-Off the Legacy Environmental Liabilities and to thwart activist pressure.  To do that, it was necessary for them to paint Resideo as a viable standalone enterprise with strong business segments to permit Honeywell to load up Resideo with as much debt as possible.  Honeywell and Adamczyk were further incentivized to prop up Resideo's stock price following the Spin-Off to enable the Company to continue as a going concern so that it would not default on the Indemnification Agreement payments.

## X.    PRESUMPTION OF RELIANCE

172.    At all relevant times, the market for Resideo's common stock was efficient for the following reasons, among others:

(a)    Resideo common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Resideo filed periodic reports with the SEC;

(c)    Resideo regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Resideo was followed by numerous securities analysts employed by major brokerage firms, including Goldman Sachs, JP Morgan, and Barclays, and who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

173.    As a result of the foregoing, the market for Resideo's common stock promptly digested current information regarding Resideo from all publicly available sources and reflected such information in the price of Resideo's common stock.  All purchasers of Resideo common stock during the Class Period suffered similar injury through their purchase of Resideo common stock at artificially inflated prices, and a presumption of reliance applies.

174.    A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## XI.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

175.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint.  The specific statements alleged herein to be false and misleading were not identified as "forward looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

176.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made,

the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Resideo who knew that those statements were false when made.

## XII.   CLASS ACTION ALLEGATIONS

177.   Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf individuals or entities, excluding Defendants and their affiliates, that purchased or otherwise acquired common stock of Resideo Technologies, Inc. during the period October 15, 2018 through October 22, 2019, inclusive and were damaged thereby.

178.   There are questions of law and fact that are common to the Class, including:

(a)   whether Defendants misrepresented material facts;

(b)   whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(c)   whether the price of Resideo's common stock was artificially inflated;

(d)   whether Honeywell and the Individual Defendants are liable as "controlling persons" under §20(a) of the Exchange Act;

(e)   whether Plaintiffs and the other members of the Class were injured as a result of Defendants' misconduct.

179.   Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs and the Class sustained damaged from Defendants' wrongful conduct.

180.   Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs have the same interests as the other members of the Class.  Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

181.   A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.

## XIII.  CLAIMS FOR RELIEF

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### <u>Against All Defendants</u>

182.    Plaintiffs repeat, incorporate and reallege each and every allegation contained above as if fully set forth herein.

183.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Resideo common stock at artificially inflated prices.

184.    Defendants:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Resideo's common stock in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

185.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operation and prospects.

54

186.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

187.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants engaged in this misconduct to conceal Resideo's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

188.    As described above, Defendants acted with scienter in committing the wrongful acts and omissions alleged herein in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them.

189.    Defendants engaged in this scheme in order to maintain and/or inflate the prices of Resideo's common stock.

190.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Resideo's common stock. Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Resideo's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

191.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs

suffered damages in connection with their purchases of Resideo common stock during the

Class Period.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### Against Defendants Honeywell, Nefkens and Ragan

192.    Plaintiffs repeat, incorporate and reallege each and every allegation set forth

above as if fully set forth herein.

193.    This Count is asserted against Defendants Honeywell, Nefkens and Ragan

for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

194.    During the indicated times within the Class Period, Defendant Honeywell

was a controlling persons of Resideo within the meaning of Section 20(a) of the Exchange

Act.  Defendant Honeywell devised and effectuated the fraudulent scheme and course of

conduct alleged herein by, among other things, creating the plan to Spin-Off Honeywell's

underperforming Homes and ADI Global Distribution business and to remove legacy

environmental liabilities from Honeywell and place them into Resideo without making full

and adequate disclosure to the investing public as to the size and scope of the environmental

remediation and related tort liability obligations.  Honeywell determined the content of all

material agreements between Honeywell and Resideo, including the Separation and

Distribution Agreement, and dictated the terms of the transactions described above.  The

Indemnification and Reimbursement Agreement was imposed on Resideo by Honeywell.

That agreement required Resideo to indemnify Honeywell in amounts equal to 90% of

payments with respect to certain environmental claims and the remediation of sites

contaminated through Honeywell's historic business operations, including the legal costs of defending such liabilities. Further, Honeywell required Resideo to pay a $1.2 billion dividend to Honeywell in connection with the Spin-Off. These obligations further reflect the influence and control exercised by Defendant Honeywell.

195. During his tenure as President and CEO of Resideo and while with Honeywell, Defendant Nefkens was a controlling person of Resideo within the meaning of Section 20(a) of the Exchange Act. By reason of his position of control and authority as Resideo's President and CEO, Defendant Nefkens had the power and authority to cause Resideo to engage in the wrongful conduct complaint of herein. Defendant Nefkens was able to and did control, directly and indirectly, the content of the public statements made by Resideo, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein during the Class Period. Moreover, as detailed above, during the time that Nefkens served as Resideo's President and CEO, he was responsible for the material misstatements and omissions made by Resideo.

196. In his capacity as Resideo's Chief Financial Officer, and as more fully described above, Defendant Ragan was a controlling person of Resideo within the meaning of Section 20(a) of the Exchange Act. By reason of his position of control and authority as Resideo's CFO, Defendant Ragan was able to and did control, directly and indirectly, the content of the public statements made by Resideo, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein during the Class Period. Moreover, as detailed above, during the time that Defendant Ragan served as CFO of Resideo, he was responsible for the material misstatements and

omissions made by Resideo.

197.     As set forth above, Resideo violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Resideo and, as a result of their own conduct, Defendants Honeywell, Nefkens and Ragan are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, Resideo is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and other members of the Class who purchased Resideo common stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Awarding such equitable/injunctive or other further relief (including, but not limited to, rescission) as the Court may deem just and proper.

## JURY DEMAND

198.     Plaintiff hereby demands a trial by jury.

DATED: January 7, 2020          Respectfully Submitted,

*/s/ Karl L. Cambronne*
Karl L. Cambronne (MN #14321)
Bryan L. Bleichner (MN #326689)
Jeffrey D. Bores (MN #227699)
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South, Suite 1700
Minneapolis, MN 55401-2138
Telephone:  (612) 339-7300
kcambronne@chestnutcambronne.com
bbleichner@chestnutcambronne.com
jbores@chestnutcambronne.com

-and-

Andrew J. Entwistle (*pro hac vice forthcoming*)
**ENTWISTLE & CAPPUCCI LLP**
500 W. 2nd Street, Suite 1900-16
Austin, Texas 78701
Telephone:  (512) 710-5960
aentwistle@entwistle-law.com

-and-

Vincent R. Cappucci (*pro hac vice forthcoming*)
**ENTWISTLE & CAPPUCCI LLP**
299 Park Avenue, 20th Floor
New York, New York 10171
Telephone:  (212) 894-7200
vcappucci@entwistle-law.com

*Counsel for Plaintiffs The Gabelli Asset Fund,
The Gabelli Dividend & Income Trust, The
Gabelli Equity Trust Inc., The Gabelli Focus
Five Fund, The Gabelli Multimedia Trust Inc.,
The Gabelli Value 25 Fund Inc., GAMCO
International SICAV and GAMCO Asset
Management Inc.*